907 A.2d 276

**Mark MAHLER**

v.

**The JOHNS HOPKINS HOSPITAL, INC.**

**No. 578, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Sept. 12, 2006.

294

Alan J. Belsky, Baltimore, for appellant.

Anthony J. Breschi, Towson, for appellee.

Panel KRAUSER, BARBERA, CHARLES E. MOYLAN, JR. (Retired, specially assigned), JJ.

KRAUSER, J.

Appellant, Mark Mahler, underwent elective plastic surgery to improve the appearance of his chin. The surgery was performed by Anthony Tufaro, M.D., at The Johns Hopkins Hospital. As a result of that surgery, his lower lip purportedly "dropped," and he now experiences numbness in his chin.

Appellant claims that Dr. Tufaro never disclosed the material risks of the surgery to him, and, based on that claim, he brought suit against appellee, The Johns Hopkins Hospital, Inc. ("Johns Hopkins") in the Circuit Court for Baltimore City. Two consecutive trials ensued. After the first ended in a judgment in favor of appellant, a new trial was granted when appellant rejected a remittitur proposed by the circuit court. After the second trial ended in a hung jury, the circuit court granted Johns Hopkins's motion for judgment notwithstanding the verdict (JNOV), prompting this appeal.[1]

Appellant presents four questions for our review. Reordered to facilitate analysis, they are:

I. Did the circuit court err in failing to allow appellant to designate a treating physician as an expert in the

---

1. Maryland Rule 2–532(b) permits a court to grant a JNOV when no verdict is returned by the jury.

second trial after his expert in the first trial was excluded on qualification grounds?

II. Did the circuit court err in granting a judgment notwithstanding the verdict in appellant's informed consent case in light of the trial evidence presented by appellant?

III. Did the circuit court abuse its discretion in denying appellant a new trial which was based on appellant's inability to present to the jury expert testimony on essential elements of his informed consent case?

IV. Did the circuit court err in failing to afford appellant the opportunity to read into the record the trial testimony of Barry M. Zide, M.D. on the basis of his unavailability pursuant to Maryland Rule 5–804?

For the reasons set forth below, we hold that the circuit court did not abuse its discretion in prohibiting appellant from designating a new expert witness in the second trial but that it did err in granting Johns Hopkins's motion for a JNOV. Accordingly, we vacate the circuit court's judgment and remand this case to that court for a new trial.

## BACKGROUND

In 1993, appellant, then twenty-six years old, underwent a chin augmentation surgery, performed by Steven Denenberg, M.D., during which a chin implant was inserted into his lower jaw. Two years later, liposuction was performed on his neck.[2] The next year, appellant consulted with Paul Manson, M.D., a plastic surgeon at The Johns Hopkins Hospital, seeking, according to Dr. Manson, "improvement in neck redundancy and improvement in the appearance of his chin." Although Dr. Manson concluded that appellant was "not a candidate for any revisional procedure on either the chin or the neck," he referred appellant to Anthony Tufaro, M.D.

---

**2.** The doctor who performed this surgery is only referred to in the record as "Dr. Dean."

When appellant met with Dr. Tufaro, Tufaro outlined four possible procedures: sliding genioplasty, platysma plication, removal of appellant's chin implant, and insertion of cheek implants. He recommended a sliding genioplasty coupled with the removal of appellant's chin implant and the placement of cheek implants. A "sliding genioplasty" involves cutting the patient's mandible in half horizontally with a reciprocating saw and separating the halves. The lower section is then moved down or forward or a combination of both to achieve the desired change in jaw appearance. Hydroxylapatite is used to fill any gaps between the two halves of the patient's mandible, and the halves are then screwed together. During that visit and those that followed, appellant was accompanied by his friend, Frances Bloom.

When appellant and Ms. Bloom next met with Dr. Tufaro to discuss undergoing the sliding genioplasty, appellant brought with him a list of approximately thirty questions about the procedure. After discussing the questions with Dr. Tufaro, he was given a consent form by the doctor. Appellant read the consent form, discussed its contents with Dr. Tufaro, and then signed it. That form warned of the major risks of the operation, stating, in part:

MAJOR RISKS OF THE OPERATION OR OTHER PRO-CEDURE AND ANESTHESIA (including such items as failure to obtain the desired result, discomfort, injury, additional therapy and death):

*Bleeding. Infection. Loss of implant. Change in sensation (Numbness).*

(Italics indicates handwritten).

On May 28, 1997, Dr. Tufaro performed the sliding genioplasty; at that time, he removed appellant's chin implant and inserted cheek implants. Approximately a week later, appellant returned to Dr. Tufaro's office to have his bandages removed. According to appellant, after the bandages were removed, he discovered that he was not able to close his mouth, that he drooled, and that his lower lip had dropped. Dr. Tufaro asserted that he just needed to "heal" and that he

would be "fine." When, on June 17, 1997, appellant complained that his lower lip had dropped further, Dr. Tufaro told him to massage the area and assured him once again that he would be "fine."

Appellant nonetheless telephoned Dr. Manson and told him that his lip had dropped and that he was having trouble with a cheek implant. On July 9, 1997, appellant saw Dr. Manson and, according to the doctor's report, "express[ed] disappointment in the appearance of his chin and the appearance of his lip." Because appellant was still healing from the surgery, Dr. Manson advised appellant to wait several months to see if matters would improve. On September 15, 1997, appellant returned to Dr. Manson complaining that his right cheek implant was bothering him and that his lip was not as prominent as it had been before the surgery. That day, Dr. Manson surgically removed appellant's right cheek implant.

In late December 1997, appellant saw Dr. Manson again. Although Dr. Manson found that his lip was "better than it was previously," appellant complained that he wanted his chin moved further forward. In his notes of that consultation, Dr. Manson wrote, "I am not sure if any further intervention is indicated and [appellant] was so advised. I personally would have difficulty doing it and feel that he probably should wait before having anything done." On December 29, 1997, Dr. Manson performed surgery on appellant to improve his lower lip position and appearance. He reattached appellant's mentalis muscle and performed a "V–Y advancement of mucosa." He also inserted a small chin implant to improve appellant's appearance.

On January 14, 1998, appellant again saw Dr. Manson, complaining about the position of his chin. At that time, Dr. Manson recorded in his notes that he found appellant's lip position "satisfactory." Fourteen days later, appellant returned, complaining that the right side of his lower lip was drooping; Dr. Manson wrote in his notes, however, that appellant's lip was "of almost normal posture" and that he

recommended that several more months elapse before he underwent further treatment.

After several more consultations with Dr. Manson to discuss his chin and lower lip, appellant sought treatment from Louis Belinfante, D.D.S. On May 26, 1998, Dr. Belinfante surgically removed the Hydroxylapatite that had been inserted during appellant's sliding genioplasty procedure.

On July 22, 2003, between the first and second trial, appellant saw Bruce Epker, D.D.S., who, according to his notes, found that appellant had a "fair[ly] classic case of mentalis muscle inferior positioning with lip incompetence." On October 7, 2003, a year before the second trial, appellant underwent surgery performed by Dr. Epker to correct the ptosis [3] of his lower lip.

## PROCEDURAL HISTORY

On August 27, 2001, appellant filed a complaint in the Circuit Court for Baltimore City against Johns Hopkins, alleging that he had not been told of all of the material risks of the sliding genioplasty and that, if he had been, he would not have gone through with the surgery. Johns Hopkins filed an answer denying liability and pleading the affirmative defenses of assumption of risk, contributory negligence, statute of limitations, and charitable immunity. On September 14, 2001, appellant amended his complaint by changing the relief requested from two million dollars to an amount "in excess of the required jurisdictional amount."

On September 18, 2001, the circuit court entered a pre-trial scheduling order requiring that appellant designate any expert witnesses by December 19, 2001; that Johns Hopkins designate any expert witnesses by March 20, 2002; and that appellant designate any rebuttal expert witnesses by April 20, 2002. On December 20, 2001, appellant designated Daniel Wilkerson, M.D., as an expert witness. According to that

---

3. Ptosis is defined as a "sinking down or prolapse of an organ." *Stedman's Medical Dictionary* 1481 (27th ed.2000).

designation, which was filed with the court, Dr. Wilkerson was going to testify that Johns Hopkins breached its duty of care "to adequately inform [appellant] of the risks associated with removal of the alloplastic chin implant" performed by Dr. Tufaro. Appellant did not designate any other expert witnesses.

Trial commenced on May 5, 2003, in the circuit court before the Honorable Allen Schwait.[4] At that trial, the court refused to qualify Dr. Wilkerson as an expert witness, thus leaving appellant without an expert witness to testify as to the risks of a sliding genioplasty. Fortunately for appellant, he was able to extract that information from Johns Hopkins's expert, Dr. Barry Zide, during his case.

The first trial ended in a verdict for appellant and an award of $50,000 in economic damages and $500,000 in non-economic damages. Two days after the verdict, Johns Hopkins filed "Defendant's Motion for a New Trial and/or Remittitur."

After argument on Johns Hopkins's motion, Judge Schwait stated, "I find this verdict excessive. I find it grossly excessive. It shocks my conscious [sic]. I find it inordinate." The judge explained that he had erred in allowing appellant and Ms. Bloom to testify as to appellant's dissatisfaction with the treatment by Dr. Manson; in permitting certain operative reports and consent forms to be introduced into evidence; in allowing appellant to wear his "chin bra" during the trial; and in permitting lay testimony regarding appellant's future pain, suffering, and loss of teeth. To rectify the matter, Judge Schwait offered to reduce the judgment to $12,500 for economic damages and to $100,000 for non-economic damages or, if appellant did not accept the remittitur, to grant Johns Hopkins's motion for a new trial.

On June 18, 2003, after appellant rejected the remittitur, the circuit court ordered a new trial. The second trial was scheduled to begin on October 29, 2003. On July 11, 2003,

---

4. The transcripts of the first trial are not included in the record before us.

appellant filed a "Request for Continuance and Issuance of a New Scheduling Order," in which he requested that the date of the trial be postponed because of a scheduling conflict and that a new scheduling order be issued so that the parties could "redesignate their experts for trial." Appellant stated:

> The evidence and testimony by [Johns Hopkins's] experts at the first trial confirmed that [appellant] is in need of at least one additional surgery. Plaintiff is now under the care of two additional physicians who were not called as fact or expert witnesses at the first trial. [Appellant] anticipates that he will undergo at least one additional surgery to his lip and chin in response to the injuries he suffered from the alleged act and omissions of [Johns Hopkins] and its agents. [Appellant] is scheduled to see Bruce Ep[k]er, M.D., of Austin, Texas, for a surgical consultation and Louis Belinfante, D.D.S., of Atlanta, Georgia, for follow-up care, both of whom are expected to serve as fact and expert witnesses at retrial.

Johns Hopkins protested the identification of any new experts because "[e]xpert identification and discovery [had] already been completed" and requested that any additional discovery by the parties be limited to appellant's "ongoing treatment and related medical information." On August 25, 2003, the circuit court granted appellant's request for a postponement of the trial, rescheduling the trial to January 12, 2004. Although the court re-opened discovery, it "limited [it] to issues of treatment rendered to [appellant] since May 28, 2003," allowing the parties to designate new expert witnesses to testify but only as to the treatment appellant received after that date.

Ten days later, appellant filed "Plaintiff's Motion to Reconsider and/or to Modify the Court's Order Dated August 25, 2003," in which he complained that the order "unfairly restrict[ed][him] from offering 'expert' testimony on the issues of standard of care, proximate cause, and damages related to the initial surgery of May 28, 1997 giving rise to the subject litigation and any of [his] subsequent treatments or evaluations before May 28, 2003." He further stated that his counsel

had been "unable to locate [his] previously designated expert, Daniel C. Wilkerson, M.D., after numerous attempts to find him."

With his motion, appellant submitted "Plaintiff's Designation of Expert Witnesses," in which he designated Dr. Wilkerson, Dr. Louis Belinfante, and Dr. Bruce Epker [5] as experts who would each testify that Johns Hopkins had "breached its duty [to him] to adequately inform him of certain material risks associated with the subject sliding genioplasty surgery with concomitant remove of the alloplastic chin implant as performed by Anthony Tufuro [sic], M.D." In opposition to that motion, Johns Hopkins argued that appellant was seeking "to take advantage of the retrial of this case and [appellant's] purported intention to undergo additional surgery to designate new expert witnesses."

On December 18, 2003, the circuit court denied appellant's motion to reconsider and ordered

that the trial testimony of the experts named by the parties since May 28, 2003, specifically Louis Belinfante, D.D.S., Bruce Epker, D.D.S., Ferdinand Ofodile, M.D. and Lise C. Van Susteren, M.D., shall be limited in scope to (a) any care and treatment of [appellant] since May 28, 2003 and (b) [appellant's] mental and physical condition since May 28, 2003, and into the future.

The court also scheduled a new trial date for November 8, 2004.

On October 1, 2004, appellant filed "Plaintiff's Supplemental Designation of Expert Witness," naming Leonard Hertzberg, M.D., as an expert who would testify that appellant "suffers from injuries directly related to and as a consequence of the surgeries performed upon [him] by Drs. Manson and Tuforo [sic] at John[s] Hopkins Hospital, and that [his] physical injuries are neither exaggerated nor contrived."

On October 8, 2004, Dr. Belinfante's telephonic deposition was taken by counsel for Johns Hopkins. After Johns Hop-

---

5. In his designation, appellant refers to Dr. Epker as Bruce Eppler.

kins's counsel had concluded his examination of Dr. Belinfante, the following exchange took place:

MR. BELSKY (Counsel for Appellant): Doctor, is it true that you received from me a two-volume set of medical records marked, "medical records of Mark Mahler versus Johns Hopkins Hospital"?

MR. SHAW (Counsel for Johns Hopkins): Let me interrupt for a second. Are you saying you're not going to comply with that Order? Is that what you're telling me, Mr. Belsky?

MR. BELSKY: Yes, I am. What I'm going to do is I'm going to put on the record that Dr. Belinfante has reviewed Mr. Mahler's complete medical chart; that he is prepared to offer testimony relative to his opinions as to the issues of informed consent; he is prepared to offer opinions as to Mr. Mahler's medical history going back to the date that he first saw Dr. Tufaro; he is prepared to offer testimony as to each procedure that any doctor did upon him; he is prepared to offer testimony as to the procedure that he performed on Mr. Mahler prior to the date of—that you've referenced; that this deposition is being held and you have been placed on notice by me on numerous occasions that I intend to offer Dr. Belinfante as both a treating physician and as an expert; and that I intend to elicit from Dr. Belinfante at trial all that I believe that I am entitled to in light of the fact that there is a new Trial Order in this case.

MR. SHAW: Well, I disagree.

MR. BELSKY: I'm not finished. I've also advised you that I do not agree with the Court's ruling, I do not agree with your characterization that for the purposes of discovery, that the Court has limited the right of an attorney to inquire into the doctor's opinions in that regard and that this doctor is prepared to offer opinions relative to his treatment, relative to his opinions on all issues that are present in this trial and we will seek review with a new trial judge or the same trial judge of that decision. And you have an opportunity to ask the doctor any questions that you wish. You are on notice that I intend to offer the doctor for this purpose so

that if you seek to claim prejudice, that you have been given the opportunity today to ask those questions relative to all of the doctor's opinions and have chosen to limit your questions to what you believe the Court has restricted you to. And I ... I disagree with your interpretation ....

MR. SHAW: All right. My response is that I chose not to and I choose not to violate the Court Order ....

\* \* \*

... And unless you have anything further, I'm prepared to terminate this deposition.

\* \* \*

You're going to ask questions?

MR. BELSKY: Yeah. I'm violating the Court Order.

MR. SHAW: Okay. Well, I'm not going to participate.

MR. BELSKY: I'm violating your interpretation of the Court Order.

Following that exchange, counsel for Johns Hopkins hung up, whereupon counsel for appellant questioned Dr. Belinfante about the risks of a sliding genioplasty. After the deposition, Johns Hopkins filed "Defendant's Motion for Sanctions and to Restrict Scope of Plaintiff's De Bene Esse Deposition of Louis S. Belinfante, D.D.S." In that motion, Johns Hopkins asked that appellant be sanctioned for violating the court's August 25th and December 18th orders restricting discovery. Noting that a de bene esse videotape deposition of Dr. Belinfante was scheduled to take place, it further requested that appellant be precluded from questioning him "on issues and opinions exceeding the scope of the Court's two previous discovery Orders."

Granting that motion, the court ordered that the scope of the de bene esse deposition of Dr. Belinfante be limited to that allowed by the December 18, 2003, order, which restricted trial testimony of newly designated experts to the treatment appellant received after the first trial and to his mental and physical condition after that proceeding had ended. Although the court ordered appellant to pay a "monetary sanction" to

Johns Hopkins for the "time and effort associated with the preparation" of that motion, it reserved on the amount of that sanction.

On November 3, 2004, five days before the second trial was to begin, appellant filed a motion asking the circuit court to reconsider the restrictions it had placed on the designation of expert witnesses and that Dr. Belinfante's de bene esse deposition be reopened. To that motion, appellant attached Dr. Belinfante's affidavit in which the doctor stated that he would testify that appellant suffered from "wound dehiscence, asymmetry, lip incompetence, lip deformity, chin deformity, injury to dental structures, neurosensory disturbance of the lip, chin, gengiva, and teeth;" that those were all material risks of, and caused by, appellant's sliding genioplasty; that the treatments that appellant received after the surgery by Dr. Tufaro were all necessitated by that surgery; that the costs of those treatments were reasonable; and that appellant did not give his informed consent to the sliding genioplasty surgery.

On November 8, 2004, the second trial began with the Honorable Joseph P. McCurdy presiding. At the beginning of that trial, after hearing argument on appellant's motion to reconsider the discovery issue, Judge McCurdy denied it.

## TRIAL

At trial, appellant testified that, at his second meeting with Dr. Tufaro, he asked if the surgery "could affect function" and that Dr. Tufaro told him "no," explaining that function was controlled by "the side muscles and they would not be involved." Although they discussed whether he could be in the sun, possible allergies, and if he might die during the surgery, Dr. Tufaro never mentioned, appellant asserted, that he could suffer a permanent loss of sensation. When appellant asked Dr. Tufaro what the "worst case scenario" was, Dr. Tufaro responded, "you might have a little bit of reduced sensation in your lower lip for about two or three months" but that it would not be permanent. Appellant further claimed that Dr. Tufaro told him that there was a possibility of infection, but

that it was "unlikely." They then discussed, according to appellant, how soon he could resume his art and weight training and if he would have any problem lifting his luggage immediately following surgery.

Appellant next testified about the consent form he signed, which stated, in part:

MAJOR RISKS OF THE OPERATION OR OTHER PROCEDURE AND ANESTHESIA (including such items as failure to obtain the desired result, discomfort, injury, additional therapy and death):

*Bleeding. Infection. Loss of implant. Change in sensation (Numbness).*

(Italics indicates handwritten).

Although Dr. Tufaro told him that it was "just some red tape" that he needed to sign, the doctor did go over the form with appellant, explaining what each of the risks listed meant. He said that the "failure to achieve desired result" risk meant that he might not be happy with how it looked because "some people might want a ton of chin. Some people might want just a little bit of chin."

As for the "discomfort" risk, Dr. Tufaro told him, "You're probably going to be in pain the first couple of days after this surgery," but that the pain would subside. As for risk of "injury," Dr. Tufaro cautioned him that he would be black and blue and swollen immediately after the surgery. The "additional therapy" referred to in the consent form Dr. Tufaro explained would be the platysmal plication, which he would not need because he was having the sliding genioplasty performed. As for "bleeding," Dr. Tufaro said that this meant that he could turn black and blue right after the surgery. Although "infection" was possible, Dr. Tufaro assured him it was "unlikely." And, as for the risk of "change in sensation (numbness)" Dr. Tufaro warned only that he could have "reduced sensation in [his] lower lip ... for two or three months." But Dr. Tufaro never discussed, appellant claimed, wound dehiscence, the possibility of losing function in his lip, the possibility

of his metalis muscle separating from his gum, or the possibility that he could suffer permanent numbness.

On cross examination, appellant admitted that he read and understood the part of the form that stated, "I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantee has been made as to the results that may be obtained."

Frances Bloom testified next. She accompanied appellant on his visits to Dr. Tufaro. She stated that Dr. Tufaro told appellant that "there would be no loss of function ... that there would be no permanent nerve damage, [and] that there could be some numbness from three to six months." She could not remember, however, whether Dr. Tufaro discussed with appellant asymmetry, bleeding, or injury to teeth.

She further stated that appellant looked at the consent form for five to ten minutes before signing it and that the consultation lasted thirty to forty minutes. She also testified that, on the morning of the surgery, Dr. Tufaro saw appellant, before surgery, and told him that he "shouldn't be so nervous" because he would "love" the result and that "there would be no chance of losing function" or dying.

Appellant next called Dr. Tufaro to testify. Unable to recall exactly what he discussed with appellant, he did testify to what he generally tells patients who are about to undergo a sliding genioplasty; that is, that they could expect numbness in their chin, lips, teeth, and gums following the surgery. He further advises them:

> [T]here will be one hundred percent incidence of numbness and tingling of your lower lip in the early postoperative period. . . . That should go away over the next few months. Some people are left with a small area of numbness, particularly underneath the chin, where there's overlap from the two sides. Some patients have a permanent area of permanent numbness ... on the chin.

He also tells them that they will experience pain and discomfort after the surgery and that they may require "touch-up surgery" and that, if their implants become infected,

they will have to be taken out. He further warns them, as to post-operative functions:

In the early postoperative period, your function will seem different to you. Your lip will feel thick. It will feel swollen. Your lip will feel numb in the early postoperative period. So, to you, you might feel like your lip is not functioning normally. It will feel like you went to the dentist and you had an injection and your lip was numb. When you go to the dentist and you walk out, you think your lip isn't working, but you're the only one that thinks that.... In the early postoperative period, this operation will affect your sensation and your function because the lip will be swollen and sore and stiff.

After stating that he counsels patients, especially patients who have had previous operations in the same area, "You may not be happy with the outcome," he disputed appellant's testimony that he never told him that there could be permanent problems. The doctor insisted that he tells patients, "You can have some permanent problems."

Dr. Tufaro conceded, however, that he does not tell patients that there is a risk of "permanent functional disability" and that is because, he explained, it "is not a common sequelae and not one of the material risks." "[U]nsightly ptosis of the chin, with or without concomitant lip incompetence," he opined, is a "very uncommon finding." It is not a "material complication," he asserted.

Although Dr. Tufaro agreed that asymmetry, lip ptosis, dimpling of the soft tissues around the chin, a change in position of the lower lip, and damage to the mentalis muscle are known risks of sliding genioplasty surgery, he did not mention those potential problems because he did not believe they were "material risks." He explained that he uses "layman's terms" rather than the "anatomic terms" in explaining the risks of the procedure to patients because patients can better understand those terms. For instance, he does not tell

patients that they could suffer an injury to the mental nerve [6] but, instead, advises them that they could have numbness, which means the same thing; and, rather than use the term "ptosis," he tells patients, "Your lip is going to be rubbery and full." But he admitted that he did not tell appellant that he could have a "permanent hanging lip."

Appellant next called Dr. Manson as an expert witness in the field of plastic and reconstructive surgery. Dr. Manson testified that a doctor must inform a patient of the material risks that are known to him even if the doctor has not experienced them during his practice. The risks of a sliding genioplasty include, he stated, death, ptosis of the chin, lip incompetence, dimpling, temporary and permanent numbness, and injury. He explained:

> You can have damage to any of the muscles that are transected. You could end up with a lip that's lower in position. You could end up with your lip not working as well as it should and the primary mechanism for that is sensory input; in other words, lack of enough sensory input to feel where your lower lip is.

Though asymmetry was a risk of the surgery, most doctors, he stated, do not inform patients of the risk because everyone has asymmetry in their face. When asked, "Do you have an opinion to a reasonable degree of medical probability whether the informed consent form listing the potential complications of injury, of numbness, of failure to achieve desired result, of the need for additional therapy or surgery, of bleeding and infection and death, whether those met with accepted standards of care within the medical community to be given prior to the procedure that [appellant] had on May 28, 1997?," Dr. Manson responded, "If you take those as geographic areas of responsibility, they do."

In a videotape that was played for the jury, Dr. Belinfante testified that the surgery performed by Dr. Epker on October

---

6. The mental nerve passes through the jaw and attaches to the chin and lower lip. *Stedman's Medical Dictionary* 1198 (27th Ed.2000).

7, 2003, was not elective, but was necessary because of appellant's drooping lip. Appellant's lip, he opined, remained in an "abnormal" position even after the surgery by Dr. Epker, but he declined to recommend any more surgery to correct the condition because it would not be "advantageous" to appellant.

Appellant attempted to introduce Dr. Zide's testimony from the first trial. He proffered that Dr. Zide testified "that the material risks of the genioplasty are wound dehiscence, nerve injury, soft tissue changes, ptosis, [and] chin deformity ... and ... that he believed that [appellant], indeed, needed one additional mentalis muscle suspension surgery that he [Dr. Zide] had offered to perform and [that] he had also stated the cost for his performing that surgery as of the date of the last trial." But Johns Hopkins objected, pointing out that appellant had not designated Dr. Zide as an expert in the case and that Dr. Zide was not unavailable under Maryland Rule 2–419(a)(3).[7]

Ruling that Dr. Zide's testimony was not admissible, the court stated:

[W]ith respect to Dr. Zide, he wasn't designated as an expert witness within the discovery period, number one. The fact that he wasn't does create prejudice to the defense because the defense was not able, although he anticipated it because of what happened in the previous trial, he was not able to—and this trial has lasted over a week already. So, had this been directed in the beginning, it may have made a difference. I'm not sure.

And the other thing that I must comment upon is based on the proffer of plaintiff, I think it's only cumulative anyway. So I'm going to rule that Dr. Zide's previously-recorded testimony is not admissible.

Johns Hopkins only called one witness to the stand, Dr. Jeffrey Posnick. Johns Hopkins presented Dr. Posnick with a

---

**7.** Rule 2–419(a)(3) allows the use of the deposition of a witness if that witness is out of state or if "the party offering the deposition has been unable to procure the attendance of the witness by subpoena."

hypothetical disclosure that a doctor might give to a patient for a sliding genioplasty:

> Your chin and your lips aren't going to feel normal. They may not feel like they're moving normally right afterward and for a period of time because they may feel tight and rubbery and numb, and the numbness most of the time goes away, but may last permanently. Your lips aren't going to move the same. You may have some impact on the feeling of your lip, the sensation of your lip, and how you perceive the lip position and actually the lip position itself. You may get food caught for a period of time in your sulcus, which is down below between . . . your lower teeth and your gu[m]. You may have bleeding. You may have infection. You may have a scar. You may have a loss of implant. You may have pain or discomfort. You may have injuries to other structures in your mouth. You may have numbness of your teeth and gums, in addition to numbness of your lips. You may have discoloration of your teeth. You may feel a step in both sides of your jaw and, most importantly, I may not be able to achieve the desired result. You may need additional surgery and that no surgery is perfect and there's no guarantees made.

Dr. Posnick was asked whether that disclosure "compl[ied] with accepted standards of care." He responded that it was "more than acceptable." He further stated that "patient dissatisfaction" covers ptosis of the chin and lip incompetence, but that motor and sensory nerve changes and infection "need to be mentioned separately." Wound healing was another risk that Dr. Posnick testified should be disclosed, but Dr. Tufaro covered that risk, he said, when he discussed bleeding, infection, and injury.

On November 22, 2004, after eight hours of deliberation, the jury was unable to reach a verdict, prompting the circuit court to declare a mistrial. Nine days later, Johns Hopkins filed a motion for JNOV. After a hearing,[8] the circuit court granted Johns Hopkins's motion, stating in a written memorandum:

---

8. No transcript of that hearing is in either the record or record extract.

It is undisputed that the [appellant] met with Dr. [Tufaro] on three occasions before undergoing surgery. [Appellant] was told of many of the risks in compliance with the *Sard* decision on materiality, and he was satisfied with Dr. [Tufaro's] explanations, because he signed the consent form and proceeded with the surgery. Dr. Posnick testified that a physician needs to supplement an informed consent with conversations with the patient. It is clear that a reasonable person in the [appellant's] position would have consented to the surgery based on the informed consent document and meetings with the physician. It may be possible that words like wound dehiscence, motor nerves and ptosis were not used by Dr. [Tufaro], but there is no doubt that [appellant] knew of the risks based on the discussions and written consent form and still agreed to the procedure.

[Appellant] argued at the JNOV hearing that Dr. Posnick testified at trial that permanent loss of sensation can occur in a small percentage of patients receiving a sliding genioplasty. And, that the risk of loss is a material risk that should be included in the informed consent and discussed with a patient to the extent that they are satisfied. The informed consent has Dr. [Tufaro's] handwritten additions listed under the category Major Risks of the Operation. One of these additions is "change in sensation (numbness)." This notation shows that Dr. [Tufaro] and [appellant] discussed a change in sensation as a major risk that may result after the surgery. The common understand[ing] of a "change in sensation" is that it feels different and nothing in the Major Risks of the Operation section of the informed consent discusses temporary changes in sensation. Therefore, a reasonable person could not argue that the informed consent was insufficient.

Dr. Posnick also testified that the risk of damage to sensory nerves should be one of the risks explained to the patient. The *Sard* decision states that a physician need not deliver a "lengthy polysyllabic discourse on all possible complications. A mini-course on medical science is not required[.]" *Id.* at 444, 379 A.2d 1014 (quoting *Cobbs v.*

*Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1, 11(1972)). Dr. [Tufaro's] conversations with [appellant] did cover the issue of "change in sensation" and therefore were more than adequate to meet the *Sard* standard.

The *Sard* court also held that "the scope of the physician's duty to inform is to be measured by the materiality of the information to the decision of the patient. A material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." *Id.* at 444, 379 A.2d 1014. Dr. [Tufaro] knew that [appellant] had serious concerns about the procedure. They met on three occasions and Dr. [Tufaro] addressed the thirty or so questions [appellant] had. Dr. [Tufaro] stated in his testimony that the amount of time he spent discussing the procedure with [appellant] surpassed that of about 95% of the patients he normally meets with. After three Meetings with Dr. [Tufaro], [appellant] signed the informed consent for the surgical procedure.

The circuit court then concluded, "All the evidence in this case, including evidence related to the number of visits between doctor and patient, the in-depth discussions, and handwritten notations on the informed consent, when viewed most favorably for [appellant], does not legally support denying [Johns Hopkins's] motion for JNOV." Subsequently, appellant filed a motion to alter or amend the judgment and a motion for a new trial, both of which the circuit court denied.

## DISCUSSION

### I

■ Appellant contends that the circuit court erred in denying appellant's request to re-open discovery and to designate Dr. Belinfante as an expert witness.[9] Appellant had

---

9. Although the circuit court prohibited appellant from designating Dr. Epker as an expert as well as Dr. Belinfante, appellant only raises as error the court's refusal to allow him to designate Dr. Belinfante.

designated only one expert witness before the first trial, Dr. Wilkerson. Because the court declined to permit Dr. Wilkerson to testify as an expert during the first trial and would not permit appellant to designate Dr. Belinfante as an expert witness for the second trial, appellant was left without his own expert witness as to the risks of a sliding genioplasty for the second trial. Moreover, his decision to reject the remittitur, he claims, was based "in large part" on his belief that he would be able to present the testimony of a new expert, Dr. Belinfante, at the second trial.

■ "In administering the discovery rules, trial judges are vested with a reasonable, sound discretion in applying them, which discretion will not be disturbed in the absence of a showing of its abuse." *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 405, 718 A.2d 1129 (1998) (quotation marks and citation omitted). In fact, in exercising that discretion, "[t]he court may at any time order that discovery be completed by a specified date or time, which shall be a reasonable time after the action is at issue." Maryland Rule 2–401(b); *see also* Maryland Rule 2–504(b).

Nor does the retrial of a case affect the broad discretionary power of the court to expand, limit, or curtail discovery. When a court grants a new trial, it does not grant anything more than that. It is the trial that is to start anew, not discovery, unless the court directs otherwise. If the court declines to grant an ensuing discovery request, that decision will not be reversed unless it amounts to an abuse of discretion.

Although another judge might have decided the issue of whether to permit appellant to designate Dr. Belinfante as an expert witness differently than this judge did, we cannot say that this judge's decision not to permit appellant to designate Dr. Belinfante constituted an abuse of discretion. In any event, since we are remanding this case for a new trial, we anticipate that this issue will be raised again and considered

anew.[10]

In the meantime, we shall not disturb the circuit court's ruling as to this issue, for the following reasons: First, the circuit court granted a new trial at the request of Johns Hopkins based on errors that it believed it had made during the first trial. None of those errors required that discovery be re-opened to events preceding the first trial and that appellant be permitted to designate a new expert witness for the second trial. The errors included: allowing appellant and Frances Bloom to testify as to appellant's dissatisfaction with Dr. Manson's treatment; permitting operative reports not relevant to the issue of informed consent to be introduced into evidence; allowing appellant to wear his chin bra throughout the trial; allowing the jury to consider damages for future pain and suffering without supporting medical testimony on that issue; allowing appellant to testify that he had been told that he could lose his teeth; and allowing Dr. Posnick's informed consent form to be used to cross examine Dr. Manson and then entered into evidence.

Second, appellant had plenty of time to designate his expert witnesses for the first trial. After the circuit court entered its scheduling order, he had three months to designate his expert witnesses. During that time, appellant chose to designate only one expert witness, Dr. Wilkerson. Over a year passed from the last date appellant had to designate an expert witness, April 20, 2002, until the first trial took place, but, during that time, he did not request an extension of time for designating expert witnesses. Nor did he petition the circuit court, after that time period had elapsed, for leave to designate other expert witnesses.

Third, according to the designation he filed with the circuit court, Dr. Wilkerson was to be "an expert medical witness in the area of general surgery" who would testify that Johns Hopkins "breached [its] duty owed to [appellant] to adequately

---

**10.** Our decision should not be interpreted as a recommendation by this Court as to how the circuit court should exercise its discretion with respect to this issue on remand.

inform him of the risks associated with removal of the alloplastic chin implant." By designating a general surgeon who had never performed a sliding genioplasty, the procedure at issue, appellant took the chance that the court would find that Dr. Wilkerson was not an expert as to this procedure. And, by designating him as his only expert witness, appellant assumed the risk of having no expert witness if the circuit court did not qualify Dr. Wilkerson as an expert.

And, finally, in December 2001, when appellant designated Dr. Wilkerson as his expert witness, he could have also designated Dr. Belinfante. Dr. Belinfante was a natural choice to testify, since he had performed surgery on appellant three and one-half years earlier. For unexplained reasons, appellant chose not to do so. The decision to forego not only Dr. Belifante's testimony at trial but to forego even the possibility of calling him as a witness, by declining to designate him as a witness, was appellant's alone.

## II

 Appellant claims that the circuit court erred in granting Johns Hopkins's motion for JNOV because there was competent evidence supporting his claim that he did not give informed consent.

 "[A] motion ... n.o.v. tests the legal sufficiency of the evidence," *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 326, 389 A.2d 887 (1978), and "is reviewed under the same standard as a judgment granted on motion during trial." *Huppman v. Tighe*, 100 Md.App. 655, 663, 642 A.2d 309 (1994). "A party is not entitled to judgment unless evidence on the issue and all inferences fairly deducible therefrom, when viewed in the light most favorable to the party against whom the motion is made, are such as to permit only one conclusion with regard to the issue." *Smith v. Miller*, 71 Md.App. 273, 278, 525 A.2d 245 (1987). "To this end, we must assume the truth of all credible evidence and all inferences of fact reasonably deductible from the evidence supporting the party opposing the motion." *Nationwide Mut.*

*Fire Ins. Co. v. Tufts,* 118 Md.App. 180, 190–91, 702 A.2d 422 (1997). "[I]f there is any competent evidence, however slight, leading to support the plaintiff's right to recover, the case should be submitted to the jury and the motion for directed verdict or the motion for judgment n.o.v. denied." *Montgomery Ward and Co., Inc., v. McFarland,* 21 Md.App. 501, 513, 319 A.2d 824 (1974). Because such evidence was before the circuit court, it erred in granting Johns Hopkins's motion for JNOV.

In *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977), the Court of Appeals discussed at length the nature of an action for medical malpractice based on a lack of informed consent. The Court stated:

> [T]he doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment.

*Id.* at 439, 379 A.2d 1014.

The Court rejected a standard for disclosure based on the norms of the profession, adopting, instead, a standard that is based on what a patient would find material to his or her decision:

> "The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever is material to the decision. Thus, the test for determining whether a potential peril must be divulged is its materiality to the patient's decision."

*Id.* at 443–44, 379 A.2d 1014 (quoting *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972)). And the Court defined a "material risk" as "one which a physician knows or ought to know [is] significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." *Id.* at 444, 379 A.2d 1014. But, the Court warned, a "physician need not

deliver a lengthy polysyllabic discourse on all possible complications. A mini-course in medical science is not required." *Id.* (quotation marks and citation omitted).

■■ Expert medical testimony is not required to establish either the scope or the breach of the physician's duty to disclose all material risks. *Id.* at 447, 379 A.2d 1014. But "[s]uch expert testimony [is] required to establish the nature of the risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure would be detrimental to a patient." *Id.* at 448, 379 A.2d 1014. Once the risks and non-disclosure of those risks have been shown, the jury must determine whether the risks in question were material and, if so, "whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed." *Id.* at 450, 379 A.2d 1014.

Both Dr. Tufaro and Dr. Manson testified as to what the risks of a sliding genioplasty surgery were. While Dr. Tufaro stated that asymmetry, lip ptosis, dimpling of the soft tissues around the chin, a change in position of the lower lip, and damage to the mentalis muscle were risks of this type of surgical procedure, Dr. Manson opined ptosis of the chin, lip incompetence, dimpling, asymmetry, and numbness, both temporary and permanent were also risks. Illustratively, Dr. Manson added, "You could end up with a lip that's lower in position. You could end up with your lip not working as well as it should. . . ." Given that testimony, a reasonable juror could have found that permanent nerve injury and a lower lip position were material risks of the surgery.

And there was evidence that Dr. Tufaro failed to disclose those risks to appellant. Appellant testified that Dr. Tufaro did not tell him that he could have permanent numbness. In fact, he insists that when he asked if the surgery could "affect function," Dr. Tufaro told him "no." Further, he testified that when he asked what the "worst case scenario" was, Dr. Tufaro told him that he "might have a little bit of reduced sensation

in [his] lower lip for about two or three months" but that it would not be permanent. Frances Bloom, a friend of appellant who was with him during his consultations with Dr. Tufaro, gave similar testimony. She stated that Dr. Tufaro told appellant that there would be no loss of function and that any numbness would be temporary. Furthermore, Dr. Tufaro admitted that he had not informed appellant of a risk that he might have a "permanent hanging lip."

Although appellant signed the informed consent form, his testimony of what Dr. Tufaro told him when the two of them discussed the risks on that form created a question as to whether it adequately advised appellant of the material risks of a sliding genioplasty. That form stated:

MAJOR RISKS OF THE OPERATION OR OTHER PROCEDURE AND ANESTHESIA (including such items as failure to obtain the desired result, discomfort, injury, additional therapy and death):

*Bleeding. Infection. Loss of implant. Change in sensation (Numbness).*

(Italics indicates handwritten).

Appellant further testified that Dr. Tufaro advised him that "failure to achieve desired results" meant that he might not be happy with the amount of change in his chin, but that another person might find it acceptable; that "discomfort" meant that he was "probably going to be in pain the first couple of days after this surgery," but that it would subside; that "injury" meant he would be black and blue and swollen immediately after the surgery; that "additional therapy" would be the platysmal plication which he would not need because he was having the sliding genioplasty performed; that "bleeding" meant that he could turn black and blue right after the surgery; that "infection" was possible but unlikely; and that "change in sensation (numbness)" meant that he could have "reduced sensation in [his] lower lip ... for two or three months." Thus, the risks listed on the form did not include permanent numbness or a change in the position of his lip and,

according to appellant, in explaining the risks noted on the form, Dr. Tufaro did not mention either of those two risks.

If the jury believed the testimony of Drs. Tufaro and Manson that the risks of the procedure included permanent numbness, loss of function, and a change in lip position and the testimony of appellant and Bloom that these risks were not disclosed, it could have reasonably found that these risks were material and a reasonable person in the appellant's position would not have gone through with the surgery, had he been informed of those risks. Therefore, the circuit court erred in granting Johns Hopkins's motion for JNOV.

### III

Appellant's claim that the circuit court erred in not granting him a new trial is based on the same arguments he made in connection with his claim that the court erred in not granting his request to designate a new expert witness. Because appellant was not permitted to present a new expert witness at the second trial, he claims that the "jury was in essence misled into a false sense that Appellant's expert support for his own case was weak if not nonexistent...."

A trial court's denial of a motion for a new trial is generally reviewed for an abuse of discretion. *Merritt v. State*, 367 Md. 17, 28, 785 A.2d 756 (2001). Only "when an alleged error is committed during the trial, when the losing party or that party's counsel, without fault, does not discover the alleged error during the trial, and when the issue is then raised by a motion for a new trial, [have we] reviewed the denial of the new trial motion under a standard of whether the denial was erroneous." *Id.* at 31, 785 A.2d 756. That is not the case here, so the circuit court's denial must be reviewed for abuse of discretion.

We have already discussed why the circuit court did not abuse its discretion in denying appellant's request to reopen discovery. Because the court did not abuse its discretion then, its denial of a new trial, based on its failure to reopen discovery, could not have constituted an abuse of discretion.

## IV

■ Appellant contends that the circuit court erred in prohibiting him from introducing into evidence the testimony Dr. Zide gave at the first trial. He claims that Dr. Zide should have been found to be unavailable and his testimony read into the record under Rule 5–804(b). That rule states:

> **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) *Former Testimony.* Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

But the circuit court did not exclude Dr. Zide's prior testimony based on that rule. The court excluded it because appellant had not designated Dr. Zide as one of his experts for the second trial and because the court found that Dr. Zide's testimony would have been "cumulative." In any event, appellant maintains that the discovery order for the second trial precluded him from naming Dr. Zide because "his treatment and testimony preceded May 28, 2003." Aside from noting this fact, appellant provides no reason for why he should have been allowed to offer Dr. Zide's prior testimony into evidence and how the circuit court's refusal to allow his testimony was an abuse of discretion. As we have already discussed, the circuit court did not abuse its discretion by limiting appellant's ability to designate new experts for the second trial. Given that holding, appellant presents no reason as to why the court could not exclude Dr. Zide's testimony in accordance with that limitation.

Nor does appellant present any argument as to why the circuit court abused its discretion in finding that Dr. Zide's testimony would be cumulative. Despite the requirement in Rule 8–504(a)(5) that a party provide "argument in support of the party's position" in his or her brief, appellant only makes

the bald assertion that Dr. Zide's testimony "was not cumulative and was more probative than any other witness testimony for the Appellant on the material risks of the surgery." An examination of the record discloses that there was substantial evidence presented at trial by both sides on the issues that Dr. Zide was to address testimonially.

For example, appellant proffered that Dr. Zide's testimony was that "the material risks of the genioplasty [were] wound dehiscence, nerve injury, soft tissue changes, ptosis, [and] chin deformity." But such testimony had already been elicited from Doctors Tufaro and Manson. Dr. Tufaro testified that the risks included lip ptosis, dimpling of the soft tissues around the chin, and a change in position of the lower lip. And Dr. Manson testified that the risks included ptosis of the chin, dimpling, damage to sensory nerves, and a lowering of the position of the lip.

Appellant also proffered at trial that Dr. Zide would testify that appellant needed an additional surgery and the cost of that surgery. After the first trial, appellant underwent additional surgery performed by Dr. Epker. That surgery was essentially the same as the surgery that Dr. Zide was to testify about. Because Dr. Belinfante did in fact testify at the second trial regarding that surgery, Dr. Zide's testimony would have been, as the circuit court ruled, cumulative. Therefore, the circuit court did not abuse its discretion in excluding Dr. Zide's testimony.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR A NEW TRIAL. COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND APPELLEE.**