994 A.2d 996

Janay BARKSDALE

v.

Leon WILKOWSKY et al.

No. 48 Sept.Term, 2009.

Court of Special Appeals of Maryland.

May 7, 2010.

370

David F. Albright (Peter G. Byrnes, Bennett & Albright, PA, on the brief), Baltimore, MD, for Appellant.

Frank F. Daily (Lisa M. Morgan, Sean P. Edwards, on the brief), Hunt Valley, MD, for Appellees.

Panel: DEBORAH S. EYLER, GRAEFF and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

GRAEFF, Judge.

This appeal arises from a lawsuit filed by appellant, Janay Barksdale, against appellees, G & S Real Estate and its two partners, Stewart Sachs and Ronald Greenwald, in which she alleged that she suffered "severe and permanent brain damage" as a result of exposure to lead-based paint in a rental property owned by appellees.[1] Following a five-day trial in the Circuit Court for Baltimore City, the jury returned a verdict in appellees' favor on all counts.

Ms. Barksdale presented eleven issues for our review, which we have consolidated and rephrased as follows:

---

1. Leon Wilkowsky initially was a defendant, but he was dismissed from the case prior to trial, and he is not a party to this appeal.

1. Did the circuit court err in its instructions to the jury by: (a) instructing about the occupant's duties regarding a dwelling unit; and (b) declining to instruct regarding the portion of the Baltimore City Housing Code that bans the use of lead-based paint?

2. Did the circuit court err in its evidentiary rulings by: (a) admitting evidence of the average blood lead level in the United States in the 1970s; (b) allowing testimony that there was not any lead paint violations on the Property in 2005; and (c) admitting evidence that Ms. Barksdale's mother smoked cigarettes and drank alcohol during her pregnancy?

3. Did the circuit court err by allowing appellees' counsel to tell the jury that he used to be a resident of, and grew up in, Baltimore City?

4. Did the circuit court err in allowing appellees' counsel to argue that the use of affidavits is unethical?

5. Did the circuit court err in denying Ms. Barksdale's motion for judgment and her motion for judgment notwithstanding the verdict?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Ms. Barksdale lived with her grandmother at 2440 West Baltimore Street in Baltimore, Maryland (the "Property") from her birth in 1988 until her grandmother vacated the Property in 1999. G & S Real Estate owned the Property, and neither G & S Real Estate nor its partners inspected the Property during the time that Ms. Barksdale resided there.

In 2005, Eduardo Tarver purchased the Property. At that time, the house was "boarded up." Mr. Tarver performed a "[t]otal gut rehab" of the Property, removing all of the interior walls, door jambs, and old window frames.

On November 21, 2006, Ms. Barksdale filed a complaint against appellees in the Circuit Court for Baltimore City.

Count I alleged that, as a result of appellees' negligence in failing to maintain and inspect the Property and abate any lead paint hazard, Ms. Barksdale "suffered severe and permanent brain damage" as a result of exposure to lead-based paint. Count II alleged that appellees violated the Maryland Consumer Protection Act by marketing and leasing the Property when appellees "knew that the dwelling ... contained flaking, loose or peeling paint or plaster or lead[-]based paint accessible to children." Ms. Barksdale requested two million dollars in damages on each count.

On October 20, 2008, appellees filed a Motion for Summary Judgment. With respect to the negligence claim, appellees argued that there was no "admissible evidence that [the Property] contained any loose, flaking or peeling lead-based paint on the newel post of the stair case," and therefore, there was no evidence that appellees "breached any duty." [2] They further argued that Ms. Barksdale had not "provided a report from a medical expert linking the alleged exposure to lead paint at [the Property] with the Plaintiff's alleged injuries." With respect to the Consumer Protection Act claim, appellees argued that Ms. Barksdale did not have standing to assert a claim under the Consumer Protection Act because "she was not alive at the time [her grandmother] entered into the lease for tenancy at the Property."

On November 12, 2008, Ms. Barksdale filed a Memorandum in Opposition to Motion for Summary Judgment. Ms. Barksdale argued that summary judgment was not proper because "lead[-]based paint was present on interior surfaces of [the Property] besides the newel post when [she] resided there," and the Property "was a substantial factor in causing the

---

**2.** A report attached to the motion indicated that, on August 8, 2008, the Property was inspected for the presence of lead-based paint. The inspector obtained one positive test for lead-based paint in one area of the house. He summarized his finding as follows: "Lead-based paint was detected above the Maryland standard ($>0.7$ mg/cm$^2$) on" a "newel post" on the "1st –2nd floor stairs." The inspector obtained negative results for lead in the vestibule, living room, dining room, kitchen, hallway, rear bedroom, bathroom, side bedroom, front bedroom, and basement.

injuries." With respect to the claim under the Consumer Protection Act, Ms. Barksdale argued that, "[e]ven though Janay was not born at the time of the inception of the lease, under the statute Janay was still a 'consumer,' because she was a prospective ... recipient of consumer realty." The circuit court denied appellees' motion for summary judgment.

Trial commenced on January 26, 2009. Ms. Barksdale, age 20, took the stand. She testified that she lived at the Property until she was 11 years old, and there was "[c]hipped, peeling paint" on the "windowsills in the hallway" and on the walls. Ms. Barksdale stated that the landlord did not do anything about the chipped and peeling paint until two weeks before she moved out.

Ms. Barksdale attended school through the sixth grade. After she left school, she worked at a fast-food restaurant for one month. Ms. Barksdale testified that she currently was raising her three children, but she was interested in becoming a medical assistant, a security guard, or "work on computers."

Emma Oliver, Ms. Barksdale's grandmother, testified that she lived at the Property for 15 years. Ms. Barksdale lived with Ms. Oliver from the time she was born until they moved out of the house. When Ms. Oliver first moved into the Property, there was paint "chipping in the windowsills and in the kitchen." Ms. Oliver testified that the landlord did not do anything about the chipped paint, and the landlord did not advise her of the dangers of lead paint. The landlord never inspected the Property while she lived there, and he did not fix the problem until immediately before she vacated the Property. Ms. Oliver acknowledged, however, that she did not report any maintenance problems or request that any work be performed on the Property. Ms. Barksdale did not have contact with any other sources of lead, including lead figures, naval paint, bolts, fishing weights, ceramic pottery, or folk medicine. Ms. Oliver acknowledged that Ms. Barksdale's mother smoked cigarettes and drank alcohol during her pregnancy.

Mr. Tarver testified that he purchased the Property in 2005, and he performed a "[t]otal gut rehab" of the Property. This entailed removing all of the interior walls, door jambs, and window frames, except for the upstairs windows, which were new. Mr. Tarver did not test for lead before undertaking these renovations. There were no outstanding housing or lead paint violations on the Property at the time he purchased it.

Ralph Shannon Cavalier, an expert in lead paint testing and assessment, testified that he was the President of an environmental consulting firm that conducts environmental tests, including testing for lead paint. An inspector from his company located lead-based paint on the staircase newel post. He testified that the "negative readings in a house of this date of construction" could be explained "by the fact that Mr. Tarver did the gut rehab in 2005." Mr. Cavalier stated that, in his opinion, "there was lead[-]based paint on the interior of the property . . . besides the [newel] post during the time period of 1988 to 1994," explaining that it was "very uncommon" for "a property of this age . . . to have one positive component . . . unless there's been a major renovation." He admitted, however, that he had never visited the Property. He further acknowledged that the positive test for lead paint on the newel post "could come from any layer of paint," noting that it could be the base layer with 12 to 15 coats of paint on top.

Dr. Barry Hurwitz, an expert in neuropsychology, testified regarding his examination and testing of Ms. Barksdale. He determined that her intelligence quotient ("IQ") was 55, which fell in the "extremely low range," a range "that we used to refer to as mild mental retardation." He explained that an IQ score of 90–109 is "average," and Ms. Barksdale's IQ score was lower than 99 percent of the population. Ms. Barksdale's scores on a "visual attention" test, an "auditory attention" test, and a "tactile sensation" test fell into the "impaired range." She "showed impairments on a wide variety of abilities compared to people who are of average level functioning." Dr. Hurwitz further testified that Ms. Barksdale was limited in her ability to read, her verbal language abilities, and her mathematical reasoning. He was not asked to determine,

however, whether Ms. Barksdale's impairments were the result of exposure to lead paint. He acknowledged that "there are lots of reasons why the brain can be impaired."

Dr. Aaron Zuckerberg, a pediatrician and an expert in childhood lead paint poisoning, testified that "the interior painted surfaces of 2440 West Baltimore Street" were "the significant contributing factor in the lead paint exposure and lead paint poisoning that Janay experience[d] from birth to 1994." He reached this conclusion based on the following factors: (1) the age of the property; (2) "there was chipping, peeling, and flaking paint at the property when they lived there"; (3) Ms. Barksdale's documented high blood lead levels; and (4) testing of the Property revealed lead paint.[3]

Dr. Zuckerberg testified that children's blood lead levels typically peak "between a year and a half and three years of age and then continually decline." He opined that it was "very likely that Janay's blood lead level peaked in the normal peak time," suggesting that Ms. Barksdale's blood level "would have been above 20 during this peak period." Dr. Zuckerberg concluded that "Janay suffered lead exposure from the time of her birth through 1994," and that "the neuropsychological impairments that Dr. Horowitz [identified] are the result of Janay's lead exposure." He testified that Ms. Barksdale's injuries were permanent.

On cross-examination, Dr. Zuckerberg acknowledged that he had not performed an examination of Ms. Barksdale, nor had he even met her or anyone in her family prior to trial. He acknowledged that Ms. Oliver stated in her deposition that Ms. Barksdale's mother consumed alcohol during pregnancy, but Dr. Zuckerberg testified that he had "no idea how much or what she drank during her pregnancy." Moreover, he did not believe anybody could tell what effect, if any, it would have on

---

**3.** Ms. Barksdale's medical records indicate that her lead levels as a child were as follows: in October 1992, when she was age four, "her blood level was 18"; in August 1993, when she was five, "her blood level was 15"; and in August 1994, when she was six, "her blood level was still 15."

her pregnancy because "we don't know how much she smoked, we don't know how much she drank." Dr. Zuckerberg testified that Ms. Barksdale could have been exposed to lead paint at other properties, depending on "the activities done at the property" and the duration of time there.

Mark Lieberman, an expert in vocational counseling in lead paint cases, testified that he evaluated Ms. Barksdale and determined that she had several "handicaps to success," including "significant mental retardation," a "history of issues with attention and concentration," "very, very low academics," "[v]ery, very little work experience," and "no transferable skills . . . that she can say she has now that she can take to another job." Mr. Lieberman testified that he did not believe that Ms. Barksdale could "obtain and maintain competitive employment," stating that Ms. Barksdale "has a total loss of earning capacity." Without these severe disabilities, "she would at least [have] been able to maintain the minimum level of competitive gainful employment."

Dr. Thomas Borzilleri, an expert in economics, testified that Ms. Barksdale's lost earning capacity was presently valued at $449,217. He reached this figure by consulting census data compiled by the federal government and determining "what is the average female with less than nine years of education likely to earn over long periods of time."

At the close of Ms. Barksdale's case, appellees moved for judgment on both counts. The court denied appellees' motion.

Appellees called two witnesses. Dr. Marianne Schuelein, an expert in neurology and lead exposure in children, testified that scientific studies indicate that low levels of lead exposure do not necessarily result in damage. With respect to studies discussed by Dr. Zuckerberg regarding possible dangers of "lower levels of lead exposure," she explained that, because you cannot determine what an individual's IQ was before he or she was exposed to lead, "you can't really prove that IQ's are decreased by lead." Rather, "[y]ou can only say there's an association."

Dr. Schuelein further testified regarding the association of lead with decreases in IQ:

Now to move a little bit further in trying to explain this very complicated principle, there are a lot of things that can cause problems that may not have been accounted for in these studies and that's why all you can say is it's an association. There are things that they try to account for in some of the studies, but you can't fully account for them. Such as ... some of the children who have lower IQ's when they have lead levels in these studies may have had parents who drank too much alcohol and they may not admit that to the people who are studying.... So there are a lot of what we call confounders, things that make this association complicated.

Dr. Schuelein testified that "[t]here are other things that are associated with decrease[s] in IQ such as lack of opportunity, lack of schooling and all of those things are also associated with lead." She reiterated that exposure to lead creates a risk of damage, "[b]ut it doesn't necessarily cause these problems."

Dr. Schuelein performed a neurological examination of Ms. Barksdale. During the examination of Ms. Barksdale, she advised Dr. Schuelein of several physical complaints, including: "she feels sometimes as if she were going to black out"; "her eyes get blurry"; "her legs sometimes feel as if they will give out"; "she gets very frustrated for no reason"; memory problems; "she thinks she's bipolar"; depression; she "doesn't sleep well"; she's contemplated suicide, and she has "pains in her heart." [4]

Dr. Francis Thomas, an expert in vocational rehabilitation and assessment, conducted an assessment of Ms. Barksdale and concluded that she was capable of employment. He noted

---

**4.** Dr. Schuelein testified that, in her opinion, Ms. Barksdale's problems were "due to a number of other things" besides lead. She stated that "[t]hese are the co[n]founding things that I mentioned earlier, the things that impact on people that you sometimes can't find out about." Counsel for appellant objected following this answer, and the court sustained the objection, instructing the jury "to disregard the question and the answer."

that she reported that she had been working, but she "left that job because of involvement with children." Ms. Barksdale indicated to Dr. Thomas that she was interested in geriatrics or nursing. Dr. Thomas stated that Ms. Barksdale reads at a sixth grade level.

At the close of all the evidence, Ms. Barksdale moved for judgment. She argued that judgment should be granted on the negligence count because the evidence was unrebutted "that there was never any inspection done by the landlord" and "there was chipping, peeling and flaking paint during the tenancy." Ms. Barksdale asserted that "those facts establish our case." With respect to the Consumer Protection Act ("CPA") claim, Ms. Barksdale argued that, pursuant to *Benik v. Hatcher*, 358 Md. 507, 750 A.2d 10 (2000), "if you have chipping, peeling, flaking paint ... then you've got the violation of the CPA."

Appellees argued that the motion should be denied because "[t]here is no legal obligation to inspect," and "[t]he jury can interpret that the way they wish." Moreover, they argued that there were other components of a negligence claim, which were clearly in dispute. With respect to the CPA claim, appellees argued that, "as to whether there was evidence of chipping and flaking paint at the inception of the tenancy is subject to interpretation of that testimony," and *Benik* "does not mean that there is a per se violation that takes it out of the realm of the jury's consideration."

The court denied Ms. Barksdale's motion for judgment. The court explained:

> Well, the court took an opportunity to read both [*Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 835 A.2d 616 (2003) ] and [*Benik*]. . . . But there was nothing in the case law that I read with regard to those matters that these issues are not jury issues or that these are per se violations of the Consumer Protection Act.
>
> Particularly when I read the [*Benik*] case on pages 533–34 quoted that the landlord need not inspect the premises before leasing, but because of the implied representation

that comes with the making of the lease, he or—if he or she fails to do so they do so at their own peril.

And the presence of chipping and flaking paint could be a predicate or evidence for the jury to consider as to whether that's a violation of the CPA. So I'm going to send both of these issues to the jury and deny Plaintiff's motion for judgment in the case.

The court subsequently instructed the jury, and counsel gave their closing argument. Later that day, the jury returned a verdict in favor of appellees on both counts.

On February 9, 2009, Ms. Barksdale filed a Motion for Judgment Notwithstanding the Verdict, reasserting the arguments she made in her motion for judgment. The circuit court denied Ms. Barksdale's motion.

This timely appeal followed.

## DISCUSSION

### I.

### Housing Code Jury Instructions

Ms. Barksdale's first contention involves the trial court's instruction to the jury relating to provisions of the Baltimore City Housing Code (the "Housing Code"). She contends that the court erred in two ways. First, she argues that "the trial court gave an improper jury instruction when it instructed the jury as to the occupant's duty under the Baltimore City Housing Code." Second, she argues that "the trial court gave an improper jury instruction by deleting the portion of the Baltimore City Housing Code which bans the use of lead[-]based paint."

Appellees contend that the jury instructions were proper. Initially, appellees argue that, "[i]n the interest of completeness, and in light of the alleged evidence of chipping and flaking paint conditions, the jury was entitled to know that the Housing Code contains obligations for both owner and occupant." Moreover, appellees argue that "a jury instruction

suggesting that the Baltimore City Housing Code bans the use of lead-based paint is improper where there is no evidence that any party 'used' or applied lead-based paint."

The court's instruction to the jury regarding the duties of the landlord and tenant pursuant to the Housing Code was as follows:

The violation of a statute which is a cause of Plaintiff's injuries or damages is evidence of negligence. The Baltimore City Housing Code states as follows; Section 103; purpose. The purpose of this code is to prevent all conditions in and about dwellings which are now or which may in the future become so unsafe, dangerous, unhygienic or insanitary as to constitute a menace to the health and safety of the people.

Section 702; good repair and safe conditions. Every building and all parts thereof used or occupied as a dwelling shall be kept in good repair in safe condition. Section 703; standards for good repair and safe condition. Good repair and safe condition shall include, but is not limited to the following standards; interior walls and floors shall be maintained free of loose materials.

Section 706; painting. All interior loose or peeling wall covering or paint shall be removed and the exposed surface shall be placed in a smooth and sanitary condition. Section 1001; prohibited occupancies. No owner shall lease or permit the subletting to another for occupancy and vacant or vacated dwelling or dwelling unit which does not comply with the provision of this code.

**Section 902A; every occupant of a dwelling or a dwelling unit shall keep in a clean and sanitary condition that part of the dwelling unit and the premises thereof which he occupies and controls. A clean and sanitary condition[ ] shall include, but is not limited to the following standards; walls and windows.**

The Baltimore City Code of public local laws provides as follows ... in any written or oral lease or agreement for rental of a dwelling intended for human habitation, the

landlord shall be deemed to covenant and warrant that a dwelling is fit for human habitation.

The Baltimore City Housing Code places a continuous duty on the landlord to maintain the property and keep it free of chipping, peeling and flaking paint at all times. It is not a violation of the law for lead paint to be present in a property. You are instructed that as a matter of law there is no evidence that the house where the Plaintiff lived was painted with lead-based paint by the Defendants.

(Emphasis added). The court omitted a sentence in § 706 of the Housing Code providing that "[n]o paint shall be used for interior painting of any dwelling, dwelling unit, rooming house or rooming unit unless the paint is free from any lead pigment." [5]

## A.

### Baltimore City Housing Code § 902

▇▇ Ms. Barksdale contends that the court erred in instructing the jury regarding § 902A, *i.e.*, that an occupant of a dwelling shall keep it "in a clean and sanitary condition." She contends that the instruction was "irrelevant to the present case" because this section of the Housing Code applies only to "dirt and filth." She further argues that, "[e]ven assuming *arguendo* that Section 902 was relevant, any statutory violation by the grandmother would not release or in any way mitigate the claim against the landlords," and a "clarifying instruction would be necessary to make it clear that the landlords could still be responsible even if Janay's grandmother did not comply with Section 902."

Appellees argue that the "trial court did not err when it instructed the jury on an occupant's duty to maintain the premises in a clean and sanitary condition" because it was a "correct statement of law" and "there was sufficient circum-

---

5. In *Brown v. Dermer*, 357 Md. 344, 367–68, 744 A.2d 47 (2000), the Court of Appeals detailed the legislative history of the Housing Code, which was enacted to protect children from lead paint poisoning.

stantial evidence in the record to support the trial court's decision to submit it to the jury." Appellees further argue that the instruction was proper under the doctrine of completeness, noting that § 902A "was one of six sections of the Baltimore City Housing Code that was read to the jury," and stating that the "jury was presented with balanced instructions as to the concomitant rights and obligations of *both* owners and occupants." [6] Moreover, appellees point out that "[t]he jury was not instructed that a tenant's failure to fulfill his/her obligations somehow relieved a landlord from his/her obligations."

■ The Court of Appeals has explained that " '[a] litigant is entitled to have his theory of the case presented to the jury, but only if that theory of the case is a correct exposition of the law and there is testimony in the case which supports it.' " *Benik*, 358 Md. at 519, 750 A.2d 10 (quoting *Sergeant Co. v. Pickett*, 285 Md. 186, 194, 401 A.2d 651 (1979)). In other words: " '(1) the instruction must correctly state the law, and (2) that law must be applicable in light of the evidence before the jury.' " *Id.*

■ Thus, a proposed instruction should not be given to the jury unless it is relevant to the issues that are before the jury. The mere fact that a statute imposes a duty on one of the parties does not make the terms of the statute relevant to the case.

For example, in *Maurer v. Pa. Nat'l Mut. Cas. Ins. Co.*, 404 Md. 60, 64–66, 945 A.2d 629 (2007), a nineteen-year-old pas-

---

**6.** The doctrine of completeness is an evidentiary doctrine. *See Rutherford v. State*, 160 Md.App. 311, 320, 863 A.2d 1031 (2004) ("The common law doctrine of verbal completeness 'allows a party to respond to the admission, by an opponent, of part of a writing or conversation, by admitting the remainder of that writing or conversation.' ") (quoting *Conyers v. State*, 345 Md. 525, 541, 693 A.2d 781 (1997)). *Accord* Md. Rule 5–106 ("When part or all of a writing or recorded statement is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."). Appellant has cited no case law for the proposition that the doctrine of completeness applies to jury instructions.

senger in an automobile accident filed an underinsured motorist action against his insurance company, and the insurance company argued that the passenger, who had a blood alcohol level that exceeded .08, was contributorily negligent and assumed the risk of any injury. The jury was instructed that "the violation of a statute which is a cause of plaintiff's injuries or damages is evidence of negligence," and that a statute prohibited an individual from making a "false statement" regarding his age to obtain alcoholic beverages. *Id.* at 66, 945 A.2d 629. The jury found against the passenger, and the Court of Appeals reversed. The Court held that, because the insurer failed to show how the passenger's use of false identification to purchase alcohol was a proximate cause of his injuries, the trial court erred in giving these instructions to the jury. *Id.* at 68, 945 A.2d 629.

This Court similarly has made clear that an instruction, even if a correct statement of law, is appropriate only if it is relevant to the issues before the jury. In *Hitch v. Hall,* 42 Md.App. 260, 267, 399 A.2d 953 (1979), we held that the trial court properly declined to instruct on legal principles that, although accurate, involved an issue that was not relevant to the case. *See also Brogden v. State,* 384 Md. 631, 644, 866 A.2d 129 (2005) (court erred in giving supplemental instruction when it did not state the "applicable law" relating to the issues before the jury for deliberations).

Here, the requested instruction regarding the occupant's duties to maintain the Property in a clean and sanitary condition, the obligation pursuant to § 902A, was not relevant to the issues before the jury, *i.e.,* whether the landlord was negligent or engaged in deceptive trade practices in renting the Property. Whether Ms. Barksdale's grandmother kept the Property clean had no bearing on the jury's assessment of those issues.

In *Bartholomee v. Casey,* 103 Md.App. 34, 66, 651 A.2d 908 (1994), *cert. denied,* 338 Md. 557, 659 A.2d 1293 (1995), a lead paint case, this Court stated that it "would have been error for the trial court to instruct the jury to find in favor of [the

defendants] based on the parents' actions." The Court explained that "[t]he law in Maryland is clear that the negligent acts of a parent cannot be imputed to the minor child, and that negligent acts of the parent that merely contribute to the injury do not necessarily rise to the level of superseding causation." *Id.* n. 16 (citing *Caroline v. Reicher*, 269 Md. 125, 304 A.2d 831 (1973)).

There was no argument here that the grandmother's actions or inactions were a superseding cause of Mr. Barksdale's injuries. Accordingly, the instruction regarding § 902 was irrelevant under the facts of this case, and the court erred in instructing the jury on § 902 of the Housing Code.

 That, however, is not the end of the inquiry. "To justify [ ] reversal, an error below must have been '... both manifestly wrong and substantially injurious.' " *Flores v. Bell,* 398 Md. 27, 34, 919 A.2d 716 (2007) (citation omitted). "Prejudice can be demonstrated by showing that the error was likely to have affected the verdict below; an error that does not affect the outcome of the case is harmless error." *Id.* at 33, 919 A.2d 716.

 Ms. Barksdale has not met her burden of showing prejudice. The court's instructions made clear that the relevant issue for the jury was the conduct of appellees, not anything done by the occupants. The court instructed that a "minor cannot be held responsible for the negligence of the minor's parent, guardian or custodian." It also instructed that it was appellees who had the duty to "maintain the property and keep it free of chipping, peeling and flaking paint at all times." Thus, the jury clearly was advised that appellees had a duty to keep the Property free of chipping paint and that Ms. Barksdale could not be held responsible for any negligence on the part of her grandmother. Moreover, there was no suggestion during closing argument that appellees were relieved in any way of their statutory obligations to keep the premises free of chipped or flaking paint or that Ms. Oliver was contributorily negligent for failing to clean up any chipped

paint. Thus, although the court erred in giving the instruction, it was harmless error that does not require a new trial.

## B.

## Lead Paint Ban

■ Ms. Barksdale also contends that the court erred in denying her request to instruct the jury that "[n]o paint shall be used for interior painting of any dwelling ... unless the paint is free from any lead pigment." As indicated, a proposed jury instruction "'must be applicable in light of the evidence before the jury.'" *Benik,* 358 Md. at 519, 750 A.2d 10 (citation omitted).

As appellees note, there was no evidence that appellees ever painted the interior of the Property, "much less paint[ed] it with lead-based paint." Given the absence of such evidence, the court instructed the jury, without objection, that "as a matter of law there is no evidence that the house where the Plaintiff lived was painted with lead-based paint by the Defendants. Thus, the Defendants did not create the condition of lead-based paint at this property." Under these circumstances, the trial court did not err in refusing to instruct the jury that "[n]o paint shall be used for interior painting of any dwelling ... unless the paint is free from any lead pigment."

## II.

## Evidentiary Rulings

Ms. Barksdale argues next that the trial court erred in several of its evidentiary rulings. Specifically, she argues that the court improperly allowed testimony regarding the following: (1) the average blood lead level in the United States in 1976; (2) that Baltimore City had not issued any lead paint violations for the Property; and (3) that Ms. Barksdale's mother smoked cigarettes and drank alcohol during her pregnancy.

Appellees argue that the evidence was relevant and the trial court properly admitted this evidence. First, appellees argue

that "evidence of average blood-lead levels in the United States in the 1970s was relevant to testimony offered by appellant's own medical expert on trends in blood-lead levels and the safety of certain blood-lead levels." Moreover, appellees argue that, even if the testimony was improperly admitted, any error was harmless. Second, appellees argue that the circuit court properly allowed testimony regarding the lack of a lead paint violation notice on the Property because "the existence, or lack thereof, of a lead paint violation notice on a property is directly relevant to a core issue in the case—the condition of the property." Third, with respect to Ms. Barksdale's mother's use of alcohol and cigarettes during pregnancy, appellees argue that "appellant's own medical expert addressed the issues of cigarette smoking and alcohol consumption during pregnancy and, in doing so, validated those issues as evidentiary considerations in the case."

"The admission of evidence is committed to the sound discretion of the trial court and will not be reversed unless there is a clear abuse of discretion." *Thomas v. State,* 397 Md. 557, 579, 919 A.2d 49 (2007). An abuse of discretion occurs " 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.' " *King v. State,* 407 Md. 682, 697, 967 A.2d 790 (2009) (citation omitted). As the Court of Appeals has made clear,

> [A] ruling reviewed under the abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.

*Brown v. Daniel Realty Co.,* 409 Md. 565, 601, 976 A.2d 300 (2009) (citations and quotations omitted).

## A.

### Average Blood Lead Level in the U.S.

Ms. Barksdale contends that the court erred in admitting Dr. Zuckerberg's testimony that, in 1976, the aver-

age blood lead level in the United States was 14.6. She argues that the testimony was irrelevant because she was not born until 1988, twelve years later. Additionally, she argues that any probative value in this evidence was outweighed by the danger of unfair prejudice, and therefore, it was inadmissible under Md. Rule 5–403. We note that Ms. Barksdale's argument in this regard is less than one page in length, and she cites no case law supporting her contention.

Appellees argue that the testimony was properly admitted because Ms. Barksdale "opened the door to this evidence" when she elicited testimony from Dr. Zuckerberg, her expert, regarding the "threshold safety lead levels" set by the Centers for Disease Control ("CDC") and the U.S. Surgeon General. In any event, appellees argue that, even if the admission of this evidence was error, it was harmless because the evidence "did not have any impact on the ultimate jury verdict."

On direct examination, Dr. Zuckerberg testified that "[t]here is no safe level for lead." Dr. Zuckerberg also testified that, in 1971, the CDC and U.S. Surgeon General "became involved in lead paint poisoning," and they "said that 40 was the lowest blood lead level that they would consider to be high." These agencies continued to lower the threshold safety level, and in 1991, "10 was the lowest level that they would consider high." Dr. Zuckerberg testified "that there was no safe level. But they said that the action level would be 10." [7]

On cross-examination, counsel for appellees questioned Dr. Zuckerberg regarding whether exposure to lead paint necessarily resulted in damage: "Can you tell us what the average blood lead level was in Baltimore City in the seventies? I was a resident of Baltimore City and grew up in Baltimore City,

---

[7]. The Court of Appeals has noted that a "child is considered to have elevated lead levels in his blood if the measurement is at least 10 μg/dL." *Jones v. Mid–Atlantic Funding Co.*, 362 Md. 661, 668 n. 12, 766 A.2d 617 (2001) (citing *Preventing Lead Poisoning in Young Children: A Statement by the Centers for Disease Control* (Oct. 1991)). It explained that μg/dL is an abbreviation for micrograms per deciliter. *Id.* In that case, the child's level was 37 μg/dL. *Id.*

I'd like to know what the environment was." Dr. Zuckerberg stated that he had information for the United States, and he testified that "[i]n 1976 the average blood lead level in the United States was 14.6." Cross-examination continued as follows:

[COUNSEL FOR APPELLEES]: You do hold the opinion that any lead exposure necessarily means damage, don't you sir?

[DR. ZUCKERBERG]: My opinion is that any exposure puts one at risk for damage.

[COUNSEL FOR APPELLEES]: Oh, okay. So it puts on[e] at risk. So exposure doesn't necessarily mean damage?

[DR. ZUCKERBERG]: Exposure doesn't mean damage. But damage done is damage permanent.

We find no error in the admission of the evidence that the average blood lead level in the United States was 14.6. Ms. Barksdale argued that her blood lead levels, ranging from 15–18, caused her mental impairments. Appellees' defense was, among other things, that Ms. Barksdale could not prove that lead caused her impairments, arguing that Ms. Barksdale's blood lead levels were not high levels. Evidence that the average blood lead level in the United States was 14.6 was relevant to appellees' defense. We find no abuse of discretion in the court's decision to admit this testimony at trial.

We turn next to Ms. Barksdale's argument that this testimony was inadmissible under Md. Rule 5–403 because any probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Ms. Barksdale cites no case law in support of this contention, and, other than the statement quoted above, she makes no argument in support of this contention. Accordingly, we decline to address it. *See Honeycutt v. Honeycutt,* 150 Md.App. 604, 618, 822 A.2d 551 (when party fails to adequately brief an argument, court may decline to address it on appeal), *cert. denied,* 376 Md. 544, 831 A.2d 4 (2003).

## B.

### Absence of Lead Paint Violations for the Property

 Ms. Barksdale argues next that the trial court erred in permitting Mr. Tarver to testify that, when he purchased the Property in 2005, there were no outstanding lead paint violations for the Property. She contends that the absence of a lead paint violation for the Property was irrelevant because "there [was] no evidence that the Baltimore City Health Department ever inspected or tested the property." Ms. Barksdale asserts that "[t]he lack of a lead paint violation would only be relevant if the property were tested and no lead paint was found." Ms. Barksdale further claims that, even if probative, the evidence was inadmissible under Md. Rule 5–403 because "the value of such evidence would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury." Again, Ms. Barksdale cites no case law in support of her argument.

Appellees argue that it "was both proper and relevant for Appellees to elicit testimony through the subsequent owner, Mr. Tarver, that when he purchased the property, there were no outstanding housing or lead-paint violation notices." They argue that Ms. Barksdale's "entire case rested upon the allegation that the subject property was in poor condition and contained lead-based paint," and the "fact that in this case there was no such inspection, and no such violation notice clearly is relevant information to the condition of the premises."

 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. As indicated, "an appellate court will not second-guess a decision as to the relevancy of evidence 'absent a clear abuse of the trial judge's discretion.'" *Parker v. State,* 156 Md.App. 252, 268, 846 A.2d 485 (citation omitted), *cert. denied,* 382 Md. 347, 855 A.2d 350 (2004).

Here, the condition of the Property and the presence of lead paint inside the Property were central issues at trial. Accordingly, we find no clear abuse of discretion in allowing into evidence testimony regarding the absence of a lead paint violation.[8]

## C.

### Alcohol and Cigarette Use During Pregnancy

 Ms. Barksdale contends that the circuit court erred in admitting evidence that her mother smoked cigarettes and drank alcohol while she was pregnant with Ms. Barksdale. Specifically, Ms. Barksdale argues that the evidence was irrelevant because "[t]here was never any evidence as to how much" her mother smoked or drank, and there was "no medical evidence stating that Janay sustained damage due to the smoking and drinking."

This issue first arose when Ms. Barksdale filed several motions *in limine* requesting that the court bar admission of this evidence. The court denied these motions. With respect to the motion seeking to exclude evidence that Ms. Barksdale's mother consumed alcohol during pregnancy, the court ruled as follows:

In this case we're at the stage with regard to the motion in limine with regards to the use of alcoholic beverages by the mother during pregnancy. And the Defendant's ability to put forth their theory of the case with regard to other possible avenues of Ms. Barksdale['s]—for a lack of a better term, deficiencies.

---

8. Moreover, we note that, in closing argument, counsel for appellees argued that the lack of a lead paint violation should be given little weight. He argued:

There's no lead paint violation notice. And apparently the problem [is] there's no Health Department inspection. Now, ladies and gentlemen, I would say and the evidence suggests the Health Department doesn't inspect every house in the city. But we heard their experts say that there are violation notices issued when the Health Department does inspect. And they typically will inspect when they're advised of a child with lead in that house. None of that is here.

And ... here we're talking about just alcoholic beverage use by Ms. Barksdale as observed by her grandmother or her mother—as observed by one of the lay persons in this case and not specifically talking about what's acceptable in the scientific community.

Counsel, I'm going to deny your motion in limine with regard to the use of alcoholic beverages by the mother in this case. I think it is a proper avenue in this particular case with regard to the Defendant being able to have a case or have a defense in this case as to the alcoholic beverage use of the mother. I think the jury needs to know the person that they're dealing with as a whole in some respects with regard to this matter.

So I'm going to allow—I'm going to deny the motion in limine with regard to alcoholic use by the mother in this case and allow counsel within certain limits to explore same.

With respect to the motion to exclude evidence of cigarette use during pregnancy, the court ruled as follows:

Smoking is one of those things that on the pack of the cigarette box it says—and it's almost just—it's lay knowledge; smoking may be hazardous to your health. And we're talking about possible hazards to health in this case. I think counsel should be able to explore that to some degree. I'm going to deny the motion in limine with regard to precluding counsel from exploring the issue of smoking in this case.

When Ms. Oliver, Ms. Barksdale's grandmother, testified, counsel for appellees asked why she was caring for Ms. Barksdale as a child, as opposed to Ms. Barksdale's mother. Counsel for Ms. Barksdale objected, arguing that this testimony was irrelevant. Counsel for appellees stated that the testimony was relevant to show that the mother "was having significant issues," including drinking alcohol during pregnancy, which were "affecting [the] young child," and it was relevant to factors impacting the child's performance. Counsel proffered that there would be testimony regarding the significance of these issues. Ms. Oliver then testified that Ms.

Barksdale's mother smoked cigarettes and drank alcohol during her pregnancy.

Before the court instructed the jury, counsel for Ms. Barksdale stated as follows:

[I]n reviewing the evidence last night, the only evidence that we have of smoking and drinking during pregnancy is the one statement by [Ms.] Oliver merely stating that fact. We don't have any expert testimony saying that the smoking and drinking during pregnancy had any negative effect at all on Janay Barksdale. . . .

So, what we have here is just this statement hanging out there without any support. . . . All it can do is let the jury speculate and they cannot speculate on an issue like that without having opinion evidence.

Although no specific relief was requested, the court apparently interpreted this statement as a request that the court instruct the jury to strike Ms. Oliver's testimony regarding alcohol consumption and smoking during pregnancy. The court denied Ms. Barksdale's request:

[T]he court is going to . . . allow that evidence to remain. That was testimony that was gleaned, I believe from the grandmother in the case as to prior smoking and drinking. I don't even know if she said alcoholic beverage. I think she said drinking though.

Jurors when they are asked to come to these proceedings are asked to come to these proceedings with their own knowledge and life experiences and bring those to the (inaudible) and then they can weigh[ ] that testimony and evidence as they wish. No, there was no expert testimony as to the effects of same on this particular Plaintiff. . . . But I'll allow the jury to do whatever assessment they want to do of that testimony if they do any assessment of it at all. Your request is denied.

Ms. Barksdale contends on appeal that "the landlords' medical expert failed to opine on the causal link (if any) between the unspecified quantity of smoking and drinking and brain damage." Therefore, she contends that the court "erred in

failing to give an instruction to the jury that such evidence was not to be considered by them." She further contends that, in light of this evidence, the court erred in declining her request to give the pattern jury instructions regarding "Susceptibility to Injury" and "Aggravation of Previous Condition."[9]

Again, appellant cites no case law in support of her argument. Under these circumstances, we will not consider the argument. *See Diallo v. State*, 186 Md.App. 22, 34, 972 A.2d 917 (where no authority cited in support of argument, issue deemed to be waived), *cert. granted*, 410 Md. 559, 979 A.2d 707 (2009); *Honeycutt*, 150 Md.App. at 618, 822 A.2d 551 (when party fails to adequately brief an argument, court may decline to address it on appeal). *Accord Van Meter v. State*, 30 Md.App. 406, 408, 352 A.2d 850 (appellate court cannot be expected to seek out law to sustain appellant's position), *cert. denied*, 278 Md. 737 (1976).

We do note, however, that even if we were to consider the issue, and even if we were to find error, we would not reverse the judgment because Ms. Barksdale has not shown prejudice. *See Livingstone v. Greater Washington Anesthesiology & Pain Consultants*, 187 Md.App. 346, 364, 978 A.2d 852 (2009) (complaining party must show error and prejudice). Initially, in reviewing appellees' closing argument, we note that the focus was on Ms. Barksdale's failure to meet her burden of proof to show either that there was chipping lead-

---

9. The pattern jury instruction for "Susceptibility to Injury" provides as follows:

> The effect that an injury might have upon a particular person depends upon the susceptibility to injury of the plaintiff. In other words, the fact that the injury would have been less serious if inflicted upon another person should not affect the amount of damages to which the plaintiff may be entitled.

*Maryland Pattern Jury Instructions*, MPJI–Cv 10:3 Susceptibility to Injury (2005). The pattern jury instruction for "Aggravation of Previous Condition" provides as follows: "A person who had a particular condition before the accident may be awarded damages for the aggravation or worsening of that condition." *Maryland Pattern Jury Instructions*, MPJI–Cv 10:4 Aggravation of Previous Condition (2008).

based paint in the residence or that any low level of exposure caused her mental impairments. At no time did counsel mention alcohol consumption or cigarette smoking by Ms. Barksdale's mother during pregnancy.

More importantly, however, is the special verdict rendered by the jury. As appellees note, the jury was asked to answer the following three questions: (1) with respect to the claim for negligence, "Do you find in favor of the Plaintiff Janay Barksdale?"; (2) with respect to the CPA claim, "Do you find in favor of the Plaintiff Janay Barksdale?"; and (3) with respect to economic and non-economic damages, "What amount of damages, if any, do you award?" The court instructed the jury regarding the elements of a claim for negligence and a claim under the CPA. The court instructed that, if the jury found for the plaintiff on the issue of liability, it would then consider the issue of damages, noting that, to recover damages, Ms. Barksdale was required to prove that appellees' conduct "was a substantial factor in causing the injuries." The jury found in favor of appellees on the issues of negligence and violation of the CPA. Accordingly, it did not reach the issue whether appellees' conduct, or other factors, caused Ms. Barksdale's injuries. Any error, therefore, in the admission of evidence of Ms. Barksdale's mother's activities during pregnancy, or in failing to give appellant's requested instructions due to this evidence, was harmless. *See Livingstone*, 187 Md.App. at 366, 978 A.2d 852 (court's failure to give requested jury instruction on causation was harmless error based on jury finding that two doctors did not breach the standard of care).

### III.

### Remark About Growing Up in Baltimore City

Ms. Barksdale's next contention is that "the trial court improperly allowed landlords' counsel to tell the jury that he at one time was a resident of Baltimore City and grew up in Baltimore City." Specifically, he cites to the following question that counsel for appellees asked Dr. Zuckerberg:

"Can you tell us what the average blood lead level was in Baltimore City in the seventies? **I was a resident of Baltimore City and grew up in Baltimore City,** I'd like to know what the environment was." (Emphasis added). Ms. Barksdale objected, and the court stated: "Overruled, If you know." Ms. Barksdale argues that this remark was "completely irrelevant" and inadmissible under Md. Rule 5–403 because it was "an attempt to put in the minds of the jury that either lead is not ubiquitous in Baltimore City housing, or even if ubiquitous, that lead does not prevent someone from attaining a high level of achievement."

Appellees contend that this argument was not preserved for appellate review, arguing that a "simple objection to the alleged prejudicial comment or evidence is not enough to preserve the issue for review." They argue that, in order to preserve this argument for appellate review, counsel was required to request a curative instruction or a limiting instruction, or make a motion for a mistrial. Appellees further argue that, even if preserved, any error was harmless.

We agree with appellees that this claim is unpreserved for our review. At no time did Ms. Barksdale object on this ground below, and the claim appears to be pure appellate afterthought. Counsel's question asked about the average blood level in the seventies, and in overruling the objection, the court stated: "If you know." This indicates that the court interpreted the objection as relating to the question regarding the average blood level in the City in the 1970s. Defense counsel did not clarify that he was objecting to counsel's statement within the question, nor did he indicate that he wanted any further relief, such as striking counsel's statement that he grew up in Baltimore. Additionally, Ms. Barksdale did not object when counsel for appellee commented, both in opening statement and in closing argument, that he grew up in Baltimore City.[10] Under these circumstances, this contention is

---

10. The parties agreed that any objection to closing argument would be made at the conclusion of argument, outside the presence of the jury. No objections were raised at that time.

not preserved for our review. *See DeLeon v. State,* 407 Md. 16, 31, 962 A.2d 383 (2008) ("Objections are waived if, at another point during the trial, evidence on the same point is admitted without objection."); *Berry v. State,* 155 Md.App. 144, 172, 843 A.2d 93 ("The failure to object as soon as the [ ] evidence was admitted, and on each and every occasion at which the evidence was elicited, constitutes a waiver of the grounds for objection."), *cert. denied,* 381 Md. 674, 851 A.2d 594 (2004).

## IV.

### Affidavits

Ms. Barksdale contends that the "the trial court improperly allowed landlord's counsel to argue that the use of affidavits is unethical." She argues that the court subsequently erred in rejecting her request to ameliorate the damage by (1) denying her request to call appellees' counsel as a witness "to combat this untrue allegation"; and (2) in denying her request for a "curative jury instruction." [11]

Appellees assert that "[t]he record is clear that Appellees *never* questioned the integrity or ethics of Appellant's counsel, either [to the] jury or during several occasions during bench conferences." They argue that "the manner in which affidavits are prepared, by whom they are prepared, and whether they are accurate is relevant information for the jury, particularly when the affidavits address issues central to the case."

Initially, we agree with appellees that Ms. Barksdale has overstated the issue regarding the affidavits. Ms. Barksdale did not point out, and we did not find, any place in the record where counsel for appellees argued "that the use of affidavits is unethical." Counsel did, however, question witnesses about statements in the affidavits. For example, counsel cross-examined Mr. Tarver, who purchased the Property in 2005,

---

**11.** The proposed jury instruction stated as follows: "There is nothing improper about a lawyer preparing an affidavit. Lawyers routinely prepare affidavits."

with respect to the affidavit he signed, which stated, in part, that he "performed a complete gut rehab of the [Property] in 2005, removing the lead paint from the walls, windows, windowsills, baseboards, and door jambs." The following occurred on cross-examination:

[COUNSEL FOR APPELLEES]: ... And that affidavit indicates that you performed gut rehab removing lead paint from the walls, windows, windowsills and otherwise. They asked you to sign an affidavit to that effect; didn't they, sir?

[MR. TARVER]: Yes.

[COUNSEL FOR APPELLEES]: To the extent that this suggests that you knew where lead was and what you were removing—doing this rehab just for lead. That's not true; is it?

[MR. TARVER]: No.

[COUNSEL FOR APPELLEES]: But they asked you to sign it anyway, correct?

[MR. TARVER]: Yes.

Counsel also cross-examined Mr. Cavaliere, an expert in lead paint testing, about an affidavit prepared by counsel that he signed on November 4, 2008:

[COUNSEL FOR APPELLEES]: Okay. And then you were asked to sign a second affidavit, apparently to add some more to your opinion on November 6th of 2008 and that affidavit—you did sign such an affidavit; didn't you, sir?

[MR. CAVALIERE]: Yes.

[COUNSEL FOR APPELLEES]: And that was also prepared by Mr. Albright's office, not your office, correct?

[MR. CAVALIERE]: Right.

After cross-examination had ended, and in response to an objection from appellees on redirect, counsel for Ms. Barksdale expressed his opinion regarding the questioning of the affidavit, stating "this is really getting to be outrageous. I mean, he's trying to say—he's trying to imply that there's something [wrong] with a lawyer preparing an affidavit." Counsel for appellees countered, "with all due respect to

counsel it's fair game. I mean, when they provide affidavits, the circumstances that they're providing it is fair game." Counsel for appellee stated that he wanted "the jury to think this case is dirty."

After Mr. Cavaliere completed his testimony, counsel for Ms. Barksdale attempted to call counsel for appellees as a witness:

> Your Honor, before I call my next witness I wanted to approach the bench because I didn't want to turn this whole trial into something of a theater or circus, but logically my next witness would be [counsel for appellees]. The reason being that [counsel for appellees] has ... now impugned me for preparing affidavits for witnesses when he knows that that's done routinely by lawyers. Particularly when I'm faced with a motion to dismiss.

The court denied counsel's request, stating: "I understand that you believe he's taking pot shots at you. I understand. I am not going to allow you to call [counsel for appellees] to the stand." At the conclusion of all the evidence, the court denied Ms. Barksdale's request to instruct the jury that there is "nothing improper about a lawyer preparing an affidavit."

We find nothing improper in the questioning regarding the affidavits. Contrary to Ms. Barksdale's contention, counsel did not argue that the use of affidavits was unethical.[12] According, we find no error or abuse of discretion in the trial court's rulings denying Ms. Barksdale's request to call counsel as a witness or to give Ms. Barksdale's requested instruction.

## V.

### Motion for Judgment & Judgment Notwithstanding the Verdict

At the close of all the evidence Ms. Barksdale moved for judgment pursuant to Md. Rule 2–519. She also filed a post-

---

12. In closing argument, counsel for appellees stated that "it's permissible for lawyers to do affidavits. It's permissible for people to sign affidavits. It's done all the time. They've got to be correct. They've got to be accurate."

trial motion for judgment notwithstanding the verdict pursuant to Md. Rule 2–532. Ms. Barksdale contends that the trial court erred in denying these motions.

██ "The standard for granting a motion for judgment notwithstanding the verdict is the same as the standard for granting a motion for judgment under Rule 2–519." PAUL V. NIEMEYER & LINDA M. SCHUETT, MARYLAND RULES COMMENTARY 448 (3rd ed. 2003). *Accord Kleban v. Eghrari–Sabet*, 174 Md.App. 60, 86, 920 A.2d 606 (2007) (motion for judgment and motion for judgment notwithstanding verdict reviewed under same standard). Moreover, the argument set forth by Ms. Barksdale is identical with respect to both of the motions. Accordingly, we shall address these claims together.

Ms. Barksdale states two grounds in support of her contention that the circuit court erred in denying her motions. With respect to the negligence claim, she argues that "there are no possible circumstances or inferences that the landlords were not negligent" because the "facts are undisputed that there was chipping, peeling, and flaking paint at the property during the entire time that Janay resided there" and "the landlords never inspected the property." With respect to the CPA claim, Ms. Barksdale argues that she was entitled to judgment in her favor because, in *Benik*, 358 Md. at 534, 750 A.2d 10, the Court of Appeals held "that chipping, peeling, and flaking paint at the inception of the lease is a violation of the [CPA]."

Appellees argue that the circuit court properly denied the motions because the presence of chipping, peeling and flaking paint at the premises "is only evidence of negligence, not negligence as a matter of law." They argue that, "[e]ven if the Appellees offered absolutely no evidence or argument on this issue at trial, [Ms. Barksdale] fails to acknowledge that the jury was free to completely disregard the testimony offered by [Ms. Barksdale]." With respect to the CPA claim, appellees argue that there was insufficient evidence "that there was any chipping, flaking or peeling *lead-based* paint at the property." Appellees further argue that, "[e]ven if [Ms. Barksdale] could have proven a technical violation of the CPA,

[she] still would be required to demonstrate that her injuries or damages were proximately caused by the violation."

As indicated, a Motion for Judgment Notwithstanding the Verdict " 'tests the legal sufficiency of the evidence' " and " 'is reviewed under the same standard as a judgment granted on motion during trial.' " *Mahler v. Johns Hopkins Hosp.*, 170 Md.App. 293, 317, 907 A.2d 276 (citations omitted), *cert. denied*, 396 Md. 13, 912 A.2d 649 (2006). "[A] party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion." Md. Rule 2–532(a). " 'A party is not entitled to judgment unless evidence on the issue and all inferences fairly deducible therefrom, when viewed in the light most favorable to the party against whom the motion is made, are such as to permit only one conclusion with regard to the issue.' " *Mahler*, 170 Md.App. at 317, 907 A.2d 276 (quoting *Smith v. Miller*, 71 Md.App. 273, 278, 525 A.2d 245 (1987)).

In *Smith,* this Court explained that, when a party carries the burden of proof, a court should grant a motion for judgment and a motion for judgment notwithstanding the verdict only in limited circumstances, *i.e.,* when

> the facts are *uncontroverted* (as opposed to merely *uncontradicted*) or the parties have agreed as to the facts and such facts and the circumstances surrounding them permit of only one inference with regard to any issue presented by the motion. *See, Alexander v. Tingle*, 181 Md. 464, 30 A.2d 737 and *Pennsylvania R. Co. v. Stallings*, 165 Md. 615, 170 A. 163. In the latter case, at 619 [170 A. 163], the Court said:
>
> > .... Nor is it true that the court can say as a matter of law that one upon whom the burden rests has discharged that burden merely because testimony offered by him was not contradicted. To so hold would be to override the decisions in a long line of cases that the jury has the right to disbelieve a witness even when uncontradicted. [citing cases] In *Harrison v. Central Construction Co. [Corp.]*,

135 Md. 170, at page 180, 108 A. 874, 878, it was said: "When the facts have been ascertained and agreed upon by the parties, or are undisputed, and there is no dispute as to the inferences to be drawn from the facts, the question becomes one of law and may be decided by the court".

This was said in a case where there was an agreed statement of facts. And it will be found, on examination of all the cases where like language is used there was no controversy about the facts. [citations omitted]. "Undisputed", as used in these cases, must be taken to mean "uncontested", rather than "uncontradicted".

71 Md.App. at 279, 525 A.2d 245 (quoting *C.S. Bowen Co. v. Maryland Nat'l Bank*, 36 Md.App. 26, 33–34, 373 A.2d 30 (1977)). With these principles in mind, we address Ms. Barksdale's claims.

## A.

### Negligence

■■■ Ms. Barksdale cites to *Brooks*, 378 Md. at 70, 835 A.2d 616, and *Polakoff v. Turner*, 385 Md. 467, 869 A.2d 837 (2005), to support her assertion that appellees were negligent as a matter of law. These cases, however, do not support Ms. Barksdale's argument.

In *Brooks*, 378 Md. at 72, 835 A.2d 616, the Court of Appeals held that, "in the context of a tort action against a Baltimore City landlord, based upon a child's consumption of lead-based paint . . . the plaintiff does not have to show that the landlord had notice of the violation to establish a *prima facie* case." Rather, "in order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Id.* at 79, 835 A.2d 616. Thus, "[w]here there is evidence that the violation of the statute proximately caused the plaintiff's injury, evidence of such violation 'is sufficient evidence to

warrant the court in submitting the case to the jury on the question of the [defendant's] negligence . . . .' " *Id.* (citation omitted). The Court added: "The trier of fact must then evaluate whether the actions taken by the defendant were reasonable under all the circumstances." *Id.*

In *Polakoff*, the Court of Appeals held that "*Brooks* applies retroactively." 385 Md. at 489, 869 A.2d 837. The Court also explained its holding in *Brooks*, noting that proof of a statutory violation is evidence of negligence, not negligence *per se:*

"[B]ecause the Code prescribes the property owner's duty to keep the property continuously free of any flaking, loose, or peeling paint, the failure to keep the property in such a condition is itself evidence of negligence.

*Brooks* does not hold that a landlord will be held strictly liable for violations of the Code; rather it reaffirmed the long-standing common law rule that a violation of a statute or ordinance is *evidence* of negligence. As we repeatedly stated in *Brooks,* proof of a statutory violation, plaintiff's membership in the class of people designed to be protected by the statute, and causation, amount to *prima facie* evidence of negligence, not negligence *per se."*

*Id.* at 478, 869 A.2d 837. Neither *Brooks* nor *Polakoff* support Ms. Barksdale's assertion that uncontradicted evidence of peeling and flaking paint in a residence and the lack of an inspection by the landlord establishes that the landlord was negligent as a matter of law.

Moreover, the issue of whether lead-based paint "proximately caused" Ms. Barksdale's injuries was a contested issue. In closing argument, counsel for appellees repeatedly raised this issue, stating: "The issue is; was [Ms. Barksdale's injury] from lead? Did lead cause the issue? That's the issue in the case." Again, he stated: "The question here is, is it because of lead? Give us a doctor who is not tainted and taken money to come in here and testify. Give us a real doctor." Because there was a disputed issue whether the chipped and flaking paint actually caused Ms. Barksdale's injuries, as well as whether the chipped paint at the premises was lead paint, the

circuit court properly denied Ms. Barksdale's motion for judgment and judgment notwithstanding the verdict.

## B.

### Consumer Protection Act

The CPA prohibits "any unfair or deceptive trade practice" in the rental of "consumer realty." Md.Code (2005 Repl.Vol., 2009 Supp.), § 13–303 of the Commercial Law Article ("C.L."). "[A]ny person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title." C.L. § 13–408(a).

In *Benik,* 358 Md. at 536, 750 A.2d 10, the Court of Appeals made clear that a plaintiff asserting a violation of the CPA in a lead paint case was not required to prove actual knowledge of the landlord that there was chipping and flaking lead-based paint on the premises. The Court explained that, "implicit in the rental of an apartment is the representation that the rental is lawful," and therefore, "[t]he presence of chipping and flaking paint in the apartment at the inception of the lease" is both a question of fact and "a Housing Code violation," which "could be the predicate for the jury to find a violation of the CPA." *Id.* at 534, 750 A.2d 10. Although "the landlord need not inspect the premises before leasing, [ ] because of the implied representation that accompanies the making of the lease, he or she fails to do so at his or her peril." *Id.* at 533–34, 750 A.2d 10.

Here, although *Benik* establishes that the presence of chipping, flaking, and peeling paint at the outset of a lease is a violation of the Housing Code and the CPA, whether there was chipped, flaking or peeling paint at the Property, and whether this paint was lead-based, were factual questions for the jury. *Id.* at 534, 750 A.2d 10. Accordingly, the court properly denied Ms. Barksdale's motions.

Moreover, "a private consumer bringing an action under the CPA must show actual injury or loss sustained **as the result of** a practice prohibited under the CPA." *Legg v.*

*Castruccio,* 100 Md.App. 748, 757, 642 A.2d 906 (1994) (emphasis added). The Court of Appeals explained:

[C.L. § ]13–408 of the CPA sets forth the private remedy created by the act: "any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title." This private remedy is purely compensatory; it contains no punitive component. Indeed, any punitive assessment under the CPA is accomplished by an imposition of a civil penalty recoverable by the State under § 13–410, as well as by criminal penalties imposed under § 13–411. **Thus, in determining the damages due the consumer, we must look only to his actual loss or injury caused by the unfair or deceptive trade practices.**

*Golt v. Phillips,* 308 Md. 1, 12, 517 A.2d 328 (1986) (emphasis added).

Here, as indicated, whether Ms. Barksdale's limited intellectual abilities were caused by lead-based paint was a disputed issue of fact for the jury. For these reasons as well, the court properly denied her motions.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**